IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE THE SEARCH OF: ) | Misc. Case No: |
| Two (2) CELLULAR TELEPHONES ) | |
| DESCRIBED AS MOTOROLA MODEL #i230 ) | |
| NEXTEL PHONE, MOTOROLA MODEL #i730 ) | |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR
SEARCH WARRANT**

I, Lavinia A. Quigley, a Detective with the Metropolitan Police Department (MPD), in Washington, D.C., first being duly sworn, do hereby depose, aver, and state:

2. I have been a sworn officer with MPD since 1989. My current rank is a detective, grade one, assigned to the Narcotic and Special Investigation Division (NSID) of the Criminal Investigations Division, or its predecessors, since August 1994. Before this assignment, I worked with the Rapid Deployment Unit (RDU) for four years, specializing in vice, narcotics, and gun-recovery investigations. Throughout my law enforcement career, I have attended classes, seminars, and special training sessions on the manufacture, packaging, use, and distribution of controlled substances, as well as the detection and apprehension of narcotics traffickers.

3. I have served as an undercover officer buying illegal narcotics for more than ten years, and have made more than 2000 undercover purchases of illicit drugs of all kinds, including cocaine powder, crack cocaine, marijuana, and heroin. Because of my experience, I frequently am asked to assist in federal narcotics investigations by making undercover purchases of illegal drugs for such agencies as the Federal Bureau of Investigation (FBI), the Drug Enforcement Administration (DEA), and the Bureau of Alcohol, Tobacco, and Firearms (ATF). In the course of my police duties, I have interviewed hundreds of persons arrested in Washington, D.C., Maryland, and Virginia engaged in the illegal narcotics trade concerning their unlawful activities. Further, I have spent many hundreds of hours engaged in secret surveillance of persons involved in illegal narcotic activity. I also have participated in a number of long-term vice investigations that have resulted in prosecutions in federal and local courts in Washington,

D.C. As a result, I often have testified in federal and local courts. In addition, I have served as the affiant for more than 200 narcotics or firearm search warrants issued by judges of the Superior Court of the District of Columbia and the U.S. District Court for the District of Columbia. Through this professional training and experience, I have become familiar with the street-level, retail, mid-level, and wholesale distribution and sale of illicit drugs and with the practices of narcotics-trafficking organizations of various sizes in the Washington, D.C., Metropolitan area. I either know the information set forth in this affidavit from what I have observed, or other sworn law enforcement officers have recounted it to me. In the rest of this affidavit, when first-person pronouns are used, they refer to me.

Based on your affiant's training, experience and extensive participation in narcotic and drug related investigations. I know that:

4.  It is common for narcotic traffickers in Washington, D.C., to keep narcotics, narcotics related items and paraphernalia, money, firearms, and firearm-related items in their residences, and/or their vehicles, and/or storage facilities, such as garages, sheds, storage lockers. In addition, they package crack cocaine for sale in varying quantities. Ziploc baggies, small and large, are the packaging material of choice. It is further common for distributions to emanate from a specific location, such as an apartment. This distribution point provides security for the drug trafficker, and it is a known location to which customers go to obtain drugs. Further, your affiant knows from training and experience, that drug traffickers often use and retain firearms, and other weapons, to protect themselves and to secure their narcotics. Additionally, narcotic traffickers keep records of their trafficking activities to ensure that they receive payment for the narcotics their customers purchase. These records may be in written or electronic form. It is also common for narcotic traffickers to utilize cellular telephones to facilitate communications, while concealing their true location, between themselves, their suppliers and their customers. In your affiant's training and experience it is common for narcotic traffickers to utilize these

cellular telephones because of their mobility, their relative security, and their belief that law enforcement has more difficulty intercepting the telephone calls. Narcotics traffickers often maintain books, records, receipts, notes, ledgers, money orders, bank records, money, safety deposit boxes and keys, telephone numbers, address books, photographs, and other documentation relating to the transportation, ordering, sale and distribution of controlled substances. Also, I am aware that these items are generally maintained and retained in the drug dealer's residence, or the home of a relative or associate where the drug dealer can obtain quick access to them. Furthermore, it is a common practice for drug dealers to secrete proceeds of drug sales and other contraband in secure locations within their residence or residences of confidants. It is also a common practice for drug dealers to utilize safes within their residence, or that of a confidant, to safeguard and conceal the above described items. It is also your affiant's experience that individuals who are in possession of firearms also store in their homes ammunition, shell casings, slugs, targets, gun cleaning kits and ownership papers.

     5.     I have previously participated in investigations; which led to the arrest and conviction of narcotics dealers. I received training and experience in interviewing and interrogation techniques, arrest procedures, search and seizure, narcotics, search warrant applications, and various other crimes. In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies. In the course of conducting these investigations, your affiant has been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; conducting short-term and long-term undercover operations, including reverse undercover drug operations; consensual monitoring and recording of both telephonic and

non telephonic communications; analyzing telephone pen register and caller identification system data; conducting court-authorized electronic surveillance; and preparing and executing search warrants which have led to substantial seizures of narcotics, firearms and other contraband. Further your affiant knows from training and experience that drug traffickers often use and retain firearms, and other weapons, to protect themselves and to secure their narcotics.

      6.    In conducting their illegal business, drug traffickers often use distinctive methods, language, and terms which to disguise conversations about their drug activities. Drug traffickers also frequently use electronic paging devices, commonly referred to as "pagers" or "beepers," to further their illegal activities. Such devices allow persons to communicate electronically with the assistance of a touch tone telephone. Each pager is assigned a telephone number and other unique attributes. A person calling a pager number from a touch tone telephone can communicate with the person possessing the pager by entering a series of numbers at the sound of an electronically transmitted signal, which is typically one or more "beeping" sounds. The numbers which the caller enters are then electronically transmitted to the person in possession of the pager. The numbers appear on the digital display of the pager. Callers typically enter a telephone number at the sound of the beep, thereby signaling the person in possession of the pager to telephone the number. Drug traffickers also frequently transmit pre-arranged numerical codes to the pager at the sound of the beep to identify themselves or to otherwise communicate information, such as price or quantity of drugs, to the person in possession of the pager. Upon receiving a page, the person in possession of the pager typically either telephones the designated phone number or returns a message to the original caller by calling that person's pager. Accordingly, criminally-related telephone conversations frequently occur over telephone lines identified by the paging individual, shortly after a page is sent. Drug traffickers use pagers to

further their illegal activities by identifying telephones, including cellular phones and public or pay phones, over which they can have a criminally-related conversation. The use of pagers in this way significantly limits the possibility that the resulting criminally-related telephone conversation will be intercepted by law enforcement authorities. Pagers also enable co-conspirators to remain in constant or ready communication with one another without restricting either party to a particular telephone or location with which they might be subject of physical surveillance by law enforcement authorities.

7. Individuals involved in narcotics trafficking keep records of their narcotics trafficking within their electronic storage devices. These may include records relating to currency, financial instruments, and other things of value and/or proceeds of financial transactions relating to obtaining, transferring, secreting or spending large sums of money made from narcotics trafficking. It is common to maintain and store the aforementioned evidence of narcotics trafficking crimes on electronic storage devices, including computers, mobile or cellular telephones, pagers, personal digital assistants (PDAs), handheld computers, MP3 players, digital hard drives, including, but not limited to IPODs, MP3 players, and external storage drives and the media to store information, including diskettes, tapes, or data storage devices.

8. Your affiant asserts there is probable cause that contained within the memory, storage, recording devices, address books, contacts list, numbers of recent calls and other elctroinic storage media or programs of **Two (2) CELLULAR TELEPHONES DESCRIBED AS MOTOROLA MODEL #i230 and NEXTEL PHONE, MOTOROLA MODEL #i730** is evidence and instrumentalities of the crimes of conspiracy to distribute and possess with the intent to distribute, and distribution and possession with the intent to distribute Cocaine. Based

upon that probable cause, your affiant seeks the issuance of search warrants for these cellular telephones. Additionally, your affiant believes there is probable cause for any electronic storage device to include the above listed found in the aforementioned electronic storage devices contain evidence of the aforementioned crimes and seeks the court to additionally issue a search warrant for such electronic storage devices in order to promptly retrieve and analyze all electronically stored data, to ensure accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, requires both on-site and laboratory analysis (if needed) by a qualified computer or electronics specialist.

      9.      Based upon your Affiant's personal experience and consultation with other law enforcement officers:

      a.      Computer hardware, software, documentation, passwords, mobile phones, communication, and other data security devices may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of criminal activities, and/or (2) the objects may have been used to collect and store information about criminal activities (in the form of electronic data). Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware, software, documentation, passwords, and data security devices which are (1) instrumentalities, fruits, or evidence of criminal activities; or (2) storage devices for information about criminal activities;

      b.      Components of a personal computer normally include the Central Processing Unit (CPU), a monitor which is commonly referred to as a "screen," a keyboard and any storage devices, i.e., hard disk drive, or magnetic tape drive. Further, your Affiant knows that a computer may include a device known as a modem which enables the computer to communicate with other computers equipped with a modem via telephone coaxial cable or other signal transmission lines. Your Affiant knows that some modems may be described as a small external component with lights on the front and a telephone line running from this item to a module in the wall. Your Affiant knows that modems may also be installed inside of a computer. Your Affiant knows that a modem is capable of sending and receiving electromagnetic signals generated by a computer across telephone lines to another modem and then to another computer to which a

        second modem is attached, thus communicating data from the sending computer to the receiving computer or vice versa;

c.     It is common for a user of such an electronic storage device, such as a computer or a cellular phone to situate peripherals, software, instructions, records, backed up data files and the like in the immediate area of a computer or electronic storage system or in the device's remote storage areas;

d.     Hardware and software may be utilized to store records which include, but are not limited to, those relating to business activities, criminal activities, associate names and addresses, and the identity and location of assets illegally gained through criminal activity. These records may be more fully described as information or data stored in the form of electronic or magnetic coding on computer media or on media capable of being read by a computer or computer-related equipment. This media includes, but is not limited to, fixed hard disks, removable hard disk cartridges, hand-held computers or other devices known as personal digital assistants ("PDAs"), zip drives, laser disks, magnetic tapes, CD-ROM, DVD media, floppy diskettes, and other related media, including those capable of storing magnetic coding;

e.     Computer hardware may be described as any and all electronic devices capable of creating, converting, displaying, transmitting or analyzing magnetic or electronic impulses or data. These devices include, but are not limited to computers, cellular phones, peripherals, such as printers, modems, plotters, circuit boards, and other electronic devices;

f.     Computer software may be described as any and all programs or instructions capable of interpretation by a computer and related devices which are stored in the form of magnetic or electronic media. These items include, but are not limited to, application software, operating systems, programs, compilers, interpreters, and other programming utilized to communicate with computer components;

g.     Computer instructions may be described as existing in the form of books, manuals, notes and the like, which include, but are not limited to, written or printed material which provides exemplars and instructions regarding the operation of computers, peripherals, and software;

h.     To completely and accurately retrieve data maintained in computer hardware or on computer software, insure accuracy and completeness of such data, and prevent the loss of the data either from accidental or programmed destruction, it is necessary that all computer equipment, peripherals, related instructions in the form of manuals and notes, as well

      as the software utilized to operate such a computer be seized and subsequently processed by a qualified computer specialist in a laboratory setting.

10. On Tuesday, December 6, 2005, at about 6:00 pm., a confidential informant (CI) working with the Metropolitan Police Department's Narcotics and Special Investigation Division called Defendant Walter Martinez on a cellular phone number xxx-xxx-xxxx, to purchase a quantity of cocaine. The CI and his vehicle were searched and found to be free of drugs or money before the meet. The CI went to Maryland to meet with defendant Martinez. Defendant Martinez entered the CI's vehicle, and after a short conversation, Martinez made a phone call, and asked for one more kilogram of cocaine. An unknown Hispanic male came to the vehicle, and gave Martinez a blue bag. A short time later defendant William Vargas-Aguilar came to the vehicle carrying what appeared to be an object wrapped in a blanket. After a brief conversation with defendant Martinez, defendant Aguilar placed the blanket/package into the passenger side of a Chevy Avalanche. Defendant Aguilar entered the Avalanche and followed defendant Martinez and the CI in the CI's vehicle, to xxxxx xxxxxx xxxxxx and xxxxx xxxx, x.x., Washington, D.C. While riding to Washington, D.C., defendant Martinez showed the CI the cocaine that was in the blue bag. As the defendants and the CI entered the area, officers stopped both vehicles. Officers recovered a blue bag, which contained a plastic bag containing approximately 1027 grams of suspected cocaine on the floor of the CI's vehicle. Recovered from the Chevy Avalanche was a black blanket on top of a plastic bag containing approximately 2071 grams of suspected cocaine and one clear plastic containing 10 grams of suspected cocaine. Both defendant Martinez and Aguilar were placed under arrest. A portion of the suspected cocaine field- tested positive for cocaine. Recovered from defendant Martinez was one

**NEXTEL PHONE, MOTOROLA MODEL #i730** and recovered from Aguilar was one **MOTOROLA MODEL #i230,** and $682 in U.S currency and mail matter.

11. Based on the listed facts your affiant submits that there is probable cause to believe that, and others were involved in the illegal use of communication facilities and the illegal distribution of narcotics in Washington, D.C., in violation of Title 21, U.S.C. Sections 841, 843 and 846. Moreover, your affiant submits that there is probable cause to believe that secreted within the confines of **Two (2) CELLULAR TELEPHONES DESCRIBED AS A NEXTEL PHONE, MOTOROLA MODEL #i730 AND A MOTOROLA MODEL #i230,** is evidence and instrumentalities of the crimes of conspiracy to distribute and possession with the intent to distribute narcotics.

_____
Lavinia A. Quigley
Detective Grade One
Narcotic and Special Investigation Division

Subscribed and sworn to before me this \_\_\_\_\_ day of December 2005

_____
United States Magistrate Judge